CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
October 30, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Megan Poff
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **DAVID EDWARD CAVALIERI,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:23cv00092** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MS. C. BOYERS, et al.,** | ) | **By: Robert S. Ballou** |
| **Defendants.** | ) | **United States District Judge** |

David Edward Cavalieri, a Virginia inmate proceeding *pro se*, filed this action under 42 U.S.C. § 1983, against numerous individuals in their personal capacity and against the Commonwealth of Virginia and the Virginia Department of Corrections, alleging deliberate indifference to his serious medical needs due to delayed dental care and multiple lapses in prescribed pain medication. The case remains pending as to five defendants, medical defendants C. Shanks (f/k/a C. Boyers), Dental Assistant; D. Bland, Institutional Medical Authority; and A. Starkey, Chief Nurse; and nonmedical defendants, S. Meinhard, Grievance Coordinator/Institutional Ombudsman, and Warden J. Woodson. Four claims remain.

1. Deliberate indifference against all defendants to Cavalieri's serious dental needs, resulting in prolonged pain and extraction of tooth # 12.

2. Deliberate indifference against Bland and Starkey to Cavalieri's need for pain medication following the extraction of tooth # 12.

3. Deliberate indifference against all defendants to Cavalieri's serious dental needs, resulting in prolonged pain and extraction of tooth # 28.

4. Deliberate indifference against Bland and Starkey to Cavalieri's serious medical need for continuity of care in receiving prescription medication.

I grant in part and deny in part the summary judgment motions as to these remaining claims.

## I. Standard of Review

The court should grant summary judgment only when the pleadings and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court must view the facts and all reasonable inferences from the facts in the light most favorable to the party opposing the motion. *Id.* at 255. The court may not consider the weight of the evidence or credibility of the parties, because that is the function of the fact finder. *Alexander v. Connor*, 105 F.4th 174, 178–79 (4th Cir. 2024). However, when a motion for summary judgment is properly supported by affidavits, the nonmoving party may not rest on the mere allegations or denials in his pleadings; instead, the nonmoving party must respond by affidavits or otherwise present specific facts from which a jury could reasonably find in his favor. *Anderson*, 477 U.S. at 256–57.

## II. Factual Background

The facts are taken in the light most favorable to the plaintiff, as the non-moving party. Cavalieri was transferred from Sussex II to Buckingham Correctional Center on October 25, 2019. Eight days before his transfer, Cavalieri had two teeth extracted. Dkt. No. 204-1 at 37. The oral surgeon at Sussex II advised Cavalieri that he had four other teeth with cavities that were restorable. These teeth were not causing Cavalieri pain, but he had learned that delay in treatment may make the problem worse. Upon arrival at Buckingham, Cavalieri advised two nurses during medical intake that he had four teeth which needed work. He also explained that he had a degenerative back condition for which he took medication. Dkt. No. 211-3 at 11. He

believes that Starkey was one of the intake nurses, but he is not positive. *Id.* at 12. He was told to bring up his issues when he saw the main medical provider. *Id.* at 13.

**A. Dental Treatment**

The focus in this case is whether the defendants were deliberately indifferent to Cavalieri's complaints of tooth pain or the need to treat two affected teeth, before extraction became the only reasonable treatment. Cavalieri had two teeth extracted while he was housed at Buckingham. Tooth #12, which is located on the upper left side of the mouth, was pulled by an oral surgeon at VCU on November 4, 2020. Tooth #28, which is on the lower right side of the mouth, was pulled on August 24, 2021.

Shanks served as a dental assistant at Buckingham and her duties included "coordinating dental appointments with outside dental providers, maintaining dental treatment schedules, responding to inmate dental requests, and witnessing refusal of treatment forms." Dkt. No. 204-1 at ⁋ 3. She prepared the treatment room and dental tools for the dentist, recorded medical histories, took x-rays, and discussed treatment decisions with the patients. *Id.* Shanks also assisted the dentist during procedures. Dkt. No. 211-1 at 27. She had no authority to prescribe medications but passed patient complaints to the dentist, who then made any treatment decisions.

Shanks explained that Buckingham had an on-site dentist at least four days a week from 2019 through 2023. Initially, Dr. Burrell served as the full-time dentist (four days a week, 10 hours a day) until he retired on April 30, 2020. Beginning after Dr. Burrell's retirement until February 2022, inmates received dental care from four rotating dental providers: Dr. Mitchell, Dr. Shakroo, Dr. Baker, and Dr. Bhwomick. Dkt. No. 204-1 at ¶ 19. Some came from other DOC facilities, and some were from the community. However, Shanks claims the facility always had an on-site dentist four days per week. Dkt. No. 211-1 at 20. Cavalieri disputes this and claims

that he never saw a dentist present at the prison. When he was in the medical building, he could look down the hallway and see an open door into the darkened dental department and an empty examination chair. The only person he saw near the dental area was Shanks, usually sitting at the scheduling desk. He heard from other inmates that no dentist worked at the facility. Dkt. No. 211-3 at 25. On one occasion, Cavalieri spoke with Warden Woodson about his tooth and how long he had been waiting to see the dentist; he told Woodson that his understanding was that the prison could send him to an outside dentist since they did not have a dentist working in the prison. Woodson said he was unaware that they had no dentist and he would check into the situation. Cavalieri never heard back from him. *Id.* at 41.

Inmates requested dental care by sending a request to the dental department, explaining the particular need, i.e. cleaning, filling, or tooth pain. Shanks scheduled the inmates for examination and treatment based upon the nature of the problem. For example, an inmate with tooth pain would be seen the next day and a routine filling might be scheduled a little further out. The schedule was a list kept on the computer. Dkt. No. 211-1 at 22−25. Shanks kept a computerized appointment schedule and received an alert to inmates who needed a filling if they had not been seen in two months. That assured an inmate did not wait "like four or five months for a filling." *Id.* at 25.

Each day, the dentist saw emergency patients in the morning – typically those who complained of pain the previous day or who needed an extraction unless complications required an outside referral. Typically, when Shanks indicated that an inmate was "on the list" or "scheduled to see the dentist," the inmate had a scheduled appointment date – typically within 30 days - unless the complaint included pain, swelling, or bleeding.

Grievance complaints are logged with the grievance coordinator and forwarded to the medical department for delivery to Shanks, typically arriving within a day or two from filing. Upon receipt of a grievance, Shanks scheduled the inmate to see the dentist and responded within 24 hours to respond to the complaint with a treatment plan. *Id.* at 41-43. Or, the dentist evaluated the records and responded to the grievance without seeing the inmate. *Id.* at 72. Emergency grievances were delivered directly to dental and were responded to within 24 hours. Shanks considered inmate complaining of facial swelling and bleeding as an emergency and scheduled an appointment for the next day a dentist was in clinic. *Id.* at 78−80.

COVID affected the delivery of dental care, both at Buckingham and in the community. The prison remained on lockdown for "three or four months, off and on." The dentist saw inmates in the pod for those with an emergency, i.e. unbearable pain "for a day or two constant." Appointments for community dentists were pushed out "a couple of weeks" for the inmate to be quarantined and test negative for COVID before the examination or treatment. *Id.* at 59−61. Routine dental care (cleanings, fillings, partial plates) became backlogged and inmates were not seen in the normal timeframe. Instead of sending three patients per day to outside providers, they could only send two inmates out every two weeks. *Id.* at 96−98.

**1. Tooth # 12**

Cavalieri submitted a medical request a week or 10 days after arriving at Buckingham on October 25, 2019. He explained the treatment recommendation from the oral surgeon at Sussex and requested to see the dentist. He received a response, signed by Shanks that he was scheduled to see the provider. Dkt. No. 211-3 at 12. Cavalieri continued to request dental treatment, including via the following documented inmate requests, all replied to by Shanks:

- 1/15/2020 – "Eleven 11 weeks ago, the dental dep't confirmed I would be scheduled: I have a cavity that needs to be treated BEFORE it has to be extracted. This was stated on my request 11 weeks ago."

  Reply (1/23/2020) - "You are on the list to see dental." Dkt. No. 211-6.

- 8/24/2020 – "per your response to my request of 8/17, yes – I would like to be sent to the oral surgeon to have my cavity-ridden, very sensitive molar removed (top upper left). {cavity also in right lower molar—what about that one?"

  Reply (8/24/2020) – "That will be determined by the oral surgeon." Dkt. No. 211-7 at 1.

- 8/28/2020 – "Please confirm a QMC request for the oral surgeon has been sent to Richmond. This tooth is VERY painful as dental/medical has ignored my requests for treatment since last December."

  Reply (9/1/2020) – "You have been scheduled to go out for oral surgeon." Dkt. No. 211-7 at 2.

- 10/26/2020 – [Informal Complaint] "The Medical Dept., Ms. Starkey, assured me twice that I was indeed scheduled to go to the {dental} oral surgeon to have my tooth extracted. As of today, 10/26/20, it has now been five weeks and I still have my rotting-in-my-mouth decaying molar that causes me pain ALL DAY! Why have I not been sent out?"

  Reply (11/2/2020) – "You are scheduled, it is taking longer because of the Covid. You will be tested before you go out and quarantined when you return." Dkt. No. 211-12 at 1.

The record does not contain any date that Shanks scheduled Cavalieri to see the dentist in the clinic, nor is there a record of Cavalieri failing to attend a dental appointment in the clinic. The record contains no explanation of why Cavalieri did not see the dentist when scheduled.

Cavalieri testified that he spoke to Ms. Shanks several times to complain about not seeing the dentist, that his tooth was sensitive and painful, and that he had trouble chewing. *Id.* at 22−26. Cavalieri tried to file grievances, but once Shanks responded that he was scheduled to see the dentist, Meinhard, the Grievance Coordinator, told him he could not file a grievance about not being seen by dental because he was scheduled to be seen. *Id.* at 35−36. Cavalieri

filed a grievance against Grievance Coordinator Meinhard on August 10, 2020, complaining that she was refusing to log his grievances. Cavalieri saw the oral surgeon, who extracted tooth # 12, on November 4, 2020, just over a year after his transfer to Buckingham. The first time anyone mentioned COVID to him as a reason for the delay was November 2, 2020.

**2. Tooth # 28**

Following Cavalieri's extraction of tooth # 12, the oral surgeon wrote that Cavalieri had possible cavities between the teeth on teeth # 5, 6, 27, and 28, which needed to be assessed for restoration. Dkt. No. 211-8 at 1. The surgeon's recommendation was recorded in the Buckingham Health Services Record on November 7, 2020, but not included in Cavalieri's separate dental record, according to Shanks. (*Id.* at 5; Dkt. No. 204-2 at 23). Shanks never reviewed the medical record because she "had no reason to," and thus, had no knowledge of Cavalieri's need for attention to the other teeth. Dkt. No. 211-1 at 65−68. Cavalieri also requested treatment, several times, for teeth # 5, 6, 27, and 28. Unless otherwise indicated, Shanks replied to each request or complaint.

- 12/7/2020 – [Inmate Request] "I want to be scheduled for general dentistry treatment for the FOUR (4) teeth noted on my 'Health Services Consultation Report' as evaluated by an oral surgeon at MCV Hospital."

  Reply (12/15/2020): "You are on the routine treatment list for dental per 720.6 policy." Dkt. No. 211-9 at 1.

- 12/19/2020 – [Offender Request] – "The control booth here does not have a copy of VDOC OP 720.6 for me to read pursuant to your response to my request for Medical/Dental Treatment of 12/07/20. *My question remains: Are you going to schedule me to see a Dentist now that you are aware I have Four (4) cavities that need treatment? Are you going to schedule me BEFORE the 4 teeth are so rotten they have to be extracted?"

  Reply (12/20/2020): "Per dental protocol – only emergency treatment will be given at this time during COVID 19. You are on the schedule for routine dental treatment." Dkt. No. 211-9 at 2.

- 12/23/2020 – [*Informal Complaint*] – Shanks has "made it clear . . . that THEY are refusing to schedule me for: diagnosed and needed dental treatment of 4 cavities. > the cavities can be treated without the need for extraction at the present time."

  Reply (1/11/2021): "You are being referred out for dental treatment." Dkt. No. 211-10 at 1.

- 2/25/2021 – [Offender Request] – "Dentist. I mean – you KNOW I'm going to sue you if you let these 4 teeth get to an extraction . . . you have to know that??"

  Reply (3/2/2021): "Referred to dental" Dkt. No. 211-9 at 3.

- 3/15/2021 – [*Written Complaint*] – "Once again, after Ms. Shanks has stated THREE (3) times that I will be seen by a dentist to treat my 4 cavities, NOTHING has been done to treat the (4) rotting teeth in my mouth BEFORE an extraction is necessary."

  Reply (3/22/2021): "You were seen on 3-16-21 for this request by oral surgeon." Dkt. No. 211-10 at 2.

- 3/31/2021 – [*Grievance*] – Shanks' response "does not address why, after stating numerous times I was 'on the list' to see a dentist—and even 'you are scheduled to go back to the oral surgeon'—Nothing was done prior to March 25, 2021. Shanks lied repeatedly. I was NOT 'seen on 3-16-21 for this request by oral surgeon.' I was not sent out." Finally saw a dentist in-house on 3/25/21. "Why did Shanks continually lie and state I had an appt. when in fact there was no appt. & no dentist." Dkt. No. 211-10 at 3.

  Reply (by Meinhard, 4/1/21) – "Incident does not match on grievance/complaint." Dkt. No. 211-10 at 4.

As stated, except for the March 31, 2021 grievance rejected by Meinhard, Shanks saw and responded to each of the above requests and complaints.

On March 25, 2021, Cavalieri was seen at the prison by an in-house dentist, who confirmed that he had cavities on the four teeth, nos. 5, 6, 27, and 28, and the dentist recommended restoration. On April 6, another dentist at Buckingham used composite fillings to fill Cavalieri's teeth. The dentist wrote in the chart that tooth # 5 required filling on three surfaces (MOD) of the tooth, as did tooth # 6 (DFL); two surfaces (DO) required filling on tooth

# 28. Tooth # 29 (sic) required filling on one surface (M), but the dentist wrote that the cavity on tooth # 29 (sic) was a deep cavity and the pulp might already be inflamed; if Cavalieri continued to experience pain, that tooth might need to be extracted. Dkt. No. 204-1 at 41. Cavalieri testified that the dentist told him he could not repair all the cavities that day and that the cavity in tooth # 28 was too deep to treat. Dkt. No. 211-3 at 85−86. He did not see a dentist for those four teeth again until tooth # 28 was extracted near the end of August 2021.[1] *Id.* at 96. But he had trouble with tooth # 28 for several weeks before that, frequently requesting treatment; unless indicated otherwise, Shanks responded to the following:

- 7/16/2021 – [offender request] - "Unfortunately, that front tooth starting with the crazy pain again. > However, MORE importantly & in need of URGENT attention: *My R-Lower canine molar (pre-molar?) Hurts bad, and 2-days of constant—3 to 5 out of 10—thumping pain . . . Sensitive to touch; can't chew. Hurts!"

  Reply (7-26-2021) – "scheduled with dental" Dkt. No. 211-9 at 4.

- 7/18/2021 – [inmate request] – "Dental: Please set as soon as possible an appt. to pull this R-lower canine molar—It is 4-6 out of 10 now—thump thump thumping all the time. Definitely too late to save it. It really hurts."

  Reply (7-21-2021) – "scheduled with dental" Dkt. No. 211-9 at 5.

- 7/24/2021 – [*Written Complaint*] – "As of July 24, 2021, I have not been seen—and dental has ignored my multiple requests to have my right lower canine molar extracted. This tooth has a cavity that was previously improperly treated and is now causing me CONSTANT PAIN; I cannot chew food on my right side due to the PAIN. Extract this tooth immediately."

  Reply (8-2-2021) – "You are scheduled with dental." Dkt. No. 211-10 at 5.

[1] On June 10, 2021, the dentist saw Cavalieri for pain in tooth # 25. The dentist prescribed an antibiotic. Dkt. No. 204-1 at 41. On July 13, 2021, Cavalieri was scheduled to have tooth # 25 extracted, but the tooth was not hurting him then, so he refused extraction. Dkt. No. 204-1 at ⁋ 49. Cavalieri testified that he later learned that nothing was wrong with tooth # 25; rather, he had been experiencing referred pain from the infection around tooth # 28. Dkt. No. 211-3 at 79.

- 7/30/2021 – [*Emergency Grievance*] – "The cavity in my R. lower canine molar has broken into the pulp of my tooth. It has been causing extreme, unbearable at times pain for 5 days. I've already submitted two sick call requests . . . I need this tooth pulled now."

  Reply (by S. Smith, LPN, 7/30/2021) – "Your grievance does not meet the definition for an emergency." Dkt. No. 211-10 at 6.

- 8/2/2021 – [*Emergency Grievance*] – "My right lower canine molar has a cavity that is now eating at the pulp. The pain is unnecessary and unbearable. This tooth needs to be extracted immediately."

  Reply (8/2/2021) – "Your grievance does not meet the definition for an emergency. This request has been referred to the dentist." Dkt. No. 211-10 at 7.

- 8/4/2021 – [*Emergency Grievance*] – "My gums are now swollen & Bleeding; can't chew food! My R. lower canine molar (premolar) has been causing me CONSTANT horrible pain for five (5) straight days now – close to 6 days! Not triaging and immediately extracting this tooth is cruel and unusual punishment and deliberate indifference. This tooth has a cavity & is leaking bacteria into my blood stream. Extract this tooth immediately."

  Reply (8/4/2021) – "Your grievance does not meet the definition for an emergency. Medication written for you and scheduled for dentist." Dkt. No. 211-10 at 8.

- 8/11/2021 – [*Written Complaint*] – "R.N. Bland: Are you aware that as of today, Aug. 10, 2021, I still have not been seen by the dentist to extract my cavity-ridden, infected tooth that has an abcess/pocket (sic) of infection half the size of my pinkie? > I've written 3 Emer. Grv., 3 Requests, 3 Inf. Compl. over the past 15 days & all that D. A. Shanks has done is tell me: "Your are scheduled." The medical negligence involved in this indifference to my medical needs is astonishing!"

  Reply (by A. Worrell, Aug. 27, 2021) – "You were seen by dental on 8-24-21." Dkt. No. 211-10 at 9.

- 8/11/2021 – [*Grievance*] – "I still have not been seen [offered treatment] by the dentist to extract my cavity-ridden infected tooth [this specifically concerns my right lower canine 'pre molar'] I have written 3 emergency grievances, 3 requests for medical treatment, 3 informal compl over the past 15 days and NOTHING medically cognizant of the injury has been done. *The medical indifference to my pain & suffering [for 15+ days now] is astonishing.* > Shanks' response 'you are scheduled with dental' DOES NOT fix the issue as this is her 4th identical response: AND I'm still in pain, suffering, cannot chew; and have an infection & unnecessary bacteria in my mouth! Dkt. No. 211-10 at 10.

Level I Response by Warden Woodson, 9/15/2021 – Unfounded. "Your condition was considered Routine Dental Treatment (Class 2) and the tooth was extracted on August 24, 2021." Dkt. No. 211-10 at 11.

**B. Medication Claims**

**1. Post-Surgical Pain Medication**

Cavalieri had Tooth #12 extracted on November 4, 2021. The oral surgeon prescribed ibuprofen and acetaminophen for Cavalieri every six hours. Dkt. No. 211-8 at 1. The nursing staff in the medical department is responsible for delivering medication to inmates at "pill call." Cavalieri did not receive the prescribed pain medication until the next morning, November 5. Dkt. No. 211-13. His grievance for this 24-hour delay was deemed founded. After getting ibuprofen at 10:40 a.m., Cavalieri states he did not get any other medication until 5 a.m. on November 6. Dkt. No. 211-14 at 1. Unlike the first delay, Cavalieri's grievance for the medication delay from November 5 to November 6 was deemed unfounded because the Medication Administration Record (MAR), initialed AH (Allison Hunter), recorded that Cavalieri was a "no show" for two doses of acetaminophen and ibuprofen at 10:40 a.m. and 4:00 p.m. on November 5. *Id.* at 3. The MAR does not show that he got any pain medication on November 5 (Dkt. No. 204-2 at 143), directly contradicting Cavalieri's assertion—and the founded finding for his first grievance—that he was given ibuprofen at 10:40 a.m. on November 5 and that he did not fail to appear to get his medicine. The contradictions between Cavalieri and the MAR records create a genuine question of fact that is material to the question of deliberate indifference in failing to provide his medication post-operatively.

Importantly, Cavalieri does not identify the prison official responsible for distributing the medication following his oral surgery. Nor does he identify the person(s) who did not dispense the prescribed medication.

**2. Systemic Medication Issues**

The parties do not dispute that there were sometimes lapses between refills of Cavalieri's prescriptions. They dispute the extent of the lapses, the reasons for lapses, and whether the lapses caused the pain Cavalieri complained of. Further, Bland states that she was never deliberately indifferent to his medical condition and never knew he had run out of medicine until he filed complaints.

Before arriving at Buckingham, Cavalieri had a prescription of Mobic for chronic back pain. Dkt. No. 204-2 at 88−89. He also took Flexeril on an as-needed basis. Dkt. No. 211-3 at 8. On October 22, 2019, three days before Cavalieri's transfer, the health care provider at Sussex II discontinued Mobic and prescribed naproxen for 90 days for treatment of Cavalieri's grade I spondylosthesis and chronic shoulder pain. Dkt. No. 204-2 at 89. Following his admission physical at Buckingham, Cavalieri was continued on naproxen. *Id.* at 86. A nurse practitioner referred him for an MRI, which was done on December 20, 2019. Efforts by the nurse practitioner and doctor to get approval for physical therapy or a steroid injection for Cavalieri were unsuccessful. *Id.* at 79. Naproxen upset Cavalieri's stomach, and on December 30, 2019, a nurse practitioner prescribed Prilosec for his stomach. *Id.* at 82. In July 2020, because of continued stomach irritation, his naproxen was reduced to 375 mg. per day and 25 mg. Pamelor (nortriptyline) was added to help control his pain. *Id.* at 74.

In August 2021, Nurse Practitioner Frost prescribed Tylenol for Cavalieri and failed to renew his naproxen and Pamelor. After Cavalieri filed a complaint, she wrote a prescription for

Pamelor on September 15, 2021, but it did not show up in the system for him to receive the pill until September 20, 2021. *Id.* at 62, 183. She wrote a prescription for naproxen on September 16, and Cavalieri received a 30-day supply on September 18 which he was allowed to keep and take as needed. *Id.* at 182. On October 6, 2021, another nurse practitioner discontinued both naproxen and Pamelor and prescribed Mobic and Flexeril for Cavalieri, because Cavalieri said this combination had been more helpful to him than the naproxen and Pamelor combination. Unbeknownst to Cavalieri, the Flexeril prescription was written only for 30 days, rather than the 90 days for Pamelor, and he ran out on November 5, 2021. He immediately requested a refill of the prescription, but it was not refilled until December 20, 2021, first available to him on December 21, 2021, 46 days after he last had the medicine. *Id.* at 198−199. When the prescription for Flexeril expired On January 21, 2022, he was prescribed Pamelor again, at 50 mg. per day. *Id.* at 202.

Cavalieri remained on Tylenol, Mobic, and Pamelor for his back from January through May 2022. On May 23, 2022, Zanaflex, a muscle relaxant, was prescribed for 7 days, but it did not enter the system for delivery to him until May 28. *Id.* at 221. He received the medicine only 6 days, the last day being June 2. After he filed a complaint, the prescription was renewed for 30 days on June 8, 2022. *Id.* at 225. Zanaflex was not renewed after July 8, but Cavalieri continued receiving Mobic, Pamelor, and Tylenol. On September 22, 2022, an as-needed 60-day prescription for Flexeril was added back to the medication list. *Id.* at 252. In December 2022, he was switched from Mobic to Celebrex and from Pamelor to Neurontin. *Id.* at 255−256.

Medical records document that Cavalieri was seen frequently by the health care providers at Buckingham for a wide range of medical problems in addition to his back, including

abdominal pain, enlarged prostate, allergic rhinitis, and microcytic anemia. The health care providers prescribed medication for all these conditions.

Cavalieri was allowed to self-administer several of his medications as “kept on person” medications, including his prostate medication (Flomax and Proscar), allergy medication (Zyrtec and Nasacort), stomach medications (Prilosec and Simethicone), and some of his back medications (naproxen, Mobic, and Tylenol). Other medications, like Pamelor, Zanaflex, and Flexeril, he had to take at daily pill call. Even though Cavalieri’s prescriptions were usually for 90 days and sometimes longer, inmates could receive only 30 days of medications which they kept on person. The inmate had the responsibility to notify the pill call nurse 8 – 10 days before a refill was needed. Dkt. No. 211-3 at 103.[2] If the 90-day prescription was expiring, he would also have to request a medical appointment to get the prescription renewed.

To get this appointment, he had to put in a request for sick call to get a new prescription. Cavalieri tried to place his sick-call request for medication renewal 30 days before the current prescription expired. He would get a response saying he had been scheduled for sick call. He would not know when he was scheduled until the morning of the appointment. Dkt. No. 211-3 at 99−100. At sick call, a nurse would verify the prescription that he needed to renew, enter the information into the computer, and tell Cavalieri she would schedule him to see the provider. By policy, the department had up to 14 days to get an inmate to sick call to see a nurse, and then up to another 14 days to get him to a provider with prescription authority, either a doctor or nurse practitioner. At Buckingham, Cavalieri states the process sometimes took longer. *Id.* at 104−106. Frequently, he ran out of one or more medication for days before he could see a doctor

[2] Eight to ten days before the prescription would run out, the inmate would peel off the barcode, with the inmate’s name on it, and give that back to the pill call nurse. The last eight pills were in blue bubbles to remind the inmate to reorder. Dkt. No. 211-3 at 103.

or nurse practitioner to give him a new prescription. *Id.* at 110. Some of the delayed medication was for treatment of conditions other than his back, including Flomax, Prilosec, and Simethicone. Dkt. No. 204-2 at 140; Dkt. No. 211-11 at 3.

Cavalieri has focused on the back medications, alleging that when any portion of nortriptyline, Flexeril, or Neurontin run out, after a day and a half, the back pain becomes unbearable. *Id.* at 129. Between October 2019 and 2023, at least one of the following medications were not timely renewed and ran out on 41 different occasions: Pamelor, Flexeril, Mobic, naproxen, Zanaflex, Neurontin, Flomax, Tylenol, Prilosec, or simethicone. Sometimes, he missed the medication for just a few days, but sometimes, he missed more than a month. Based on the MARs, considering only the back medication, the following table shows the delays that Cavalieri contends rise to the level of causing serious harm.

| Medication | Rx stopped | Last 30-day KOP rec'd | Last day had medicine | New Rx written | Med available | Days w/out med |
|---|---|---|---|---|---|---|
| **Naproxen** | 04/22/20 | 04/18/20 | 05/18/20 | 05/21/20 | 05/25/20 | 6 |
| **Pamelor** | 10/26/20 | N/A | 10/26/20 | 12/29/20 | 12/30/20 | 64 |
| **Pamelor** | 04/05/21 | N/A | 04/04/21 | 04/08/21 | 04/09/21 | 4 |
| **Naproxen** | 04/05/21 | 03/26/21 | 04/25/21 | 05/12/21 | 05/25/21 | 29 |
| **Pamelor** | 05/10/21 | N/A | 05/10/21 | 05/10/91 | 05/19/21 | 8 |
| **Pamelor** | 08/07/21 | N/A | 08/07/21 | 09/15/21 | 09/20/21 | 43 |
| **Naproxen** | 08/09/21 | 08/06/21 | 09/05/21 | 09/16/21 | 09/18/21 | 12 |
| **Flexeril** | 11/05/21 | N/A | 11/05/21 | 12/22/21 | 12/24/21 | 47 |
| **Mobic** | 04/11/22 | N/A | 04/11/22 | 04/22/22 | 04/24/22 | 12 |
| **Mobic** | 06/08/22 | N/A | 06/08/22 | 06/08/22 | 06/14/22 | 5 |
| **Neurontin** | 02/09/23 | N/A | 12/31/22 | N/A – ran out of stock | 01/07/23 | 6 |

Cavalieri initiated the following grievances via informal or written complaints specifically on this issue:

- 05/19/20 – He had put in three sick call requests to be seen for medication renewal and still had not been called. Now, his medication had run out and he was "in A LOT of pain."

  Bland's Reply on 5/31/20: "NP Yisreal reviewed your chart on 5/26/20 and ordered labs. You will be seen by the provider soon." Dkt. No. 211-11 at 1.

- 10/19/20 – "The medical Dep't has made a HABIT out of not reordering my prescriptions in a timely manner even though I ALWAYS give a nurse my 'refill order 8 to 10 days before my pills run out. On Sunday, 10/18, I was told . . . (one of my medications) was not ordered because it was discontinued. WHY wasn't I told that 10 days ago when I handed in the refill request?

  Bland's Reply on 10/28/20: "You were seen today for a med renewal for naproxen, simethicone, Flomax, and Prilosec. You have been referred to the provider. *Id.* at 3. [Subsequent grievance unfounded at Level I, decision upheld at Level II. *Id.* at 4−6]

- 12/21/20 – "I was brought into medical for an NP appointment on 12/8/20. My neurological medication was renewed. I was told 5−8 days. As of 12/21, you ppl. still have not given me my prescription!"

  Bland's Reply on 1/1/21: "Your nortriptyline was renewed on 12/29/20 by the provider." *Id.* at 9.

- 12/24/20 – "On Dec. 24th, 2020 at 2:20 p.m. – while at the medical dep't – RN Strickland informed me, upon looking at and reviewing my medical chart with me, that RN Lemmon had NOT received a Nurse Practitioner's okay and signature to refill/renew my medication AS HE TOLD ME HE DID on 12/8/20 while in medical on an appt. RN Lemmon flat-out Lied to me concerning a serious medical issue and has thus caused a significant delay in my medication."

  Bland's Reply on 1/8/21: "The provider renewed your Pamelor 25 mg on 12/28/20." *Id.* at 10. [Subsequent grievance unfounded at Level I. *Id.* at 11−13.]

- 7/24/21 – "As of 7/24/21, the Medical Dept. and/or Nurse Practitioner Butler have not see (sic) me – in any sort of timely manner – to renew my medications as per my medical request. I've already been to the prerequisite 'sick call.' I am in pain due to NP Butler AND RN Bland not seeing me within 7 days and not prescribing my needed medication."

Bland's Reply on 8/2/21: "You were at work on 7/9/21 when you were scheduled to see NP Berry. You will be rescheduled." *Id.* at 14. [Follow-up grievance rejected. *Id.* at 15−16.]

- 9/2/21 – "I have not been seen for my legitimate, genuine, and serious medical needs. Not only did your Nurse Practitioner NOT renew my Pamelor, but my naproxen is due to expire – she didn't renew that either. Thus, my long awaited-for appointment with her was useless!"

  Starkey's Reply on 9/16/21: "Your nortriptyline [Pamelor] was renewed on 9/15/21. You will be referred to the provider." *Id.* at 17. [Subsequent grievance unfounded at Level I. *Id.* at 18−20.]

- 9/18/21 – "As of Sept. 18th, it has now been forty-one (41) days since my Pamelor medication has run out. Despite 3 requests to medical for an appointment to see a Nurse Practitioner to get the medication renewed—and supposedly being "scheduled" – nothing has been done to renew the medication. I am in pain; I don't sleep; my back is out of alignment and you are depriving me of NEEDED medication."

  Bland's Reply on 9/23/21 – "On 9/20/21 your nortriptyline 50 mg was renewed." *Id.* at 22. [Subsequent grievance rejected as duplicative. *Id.* at 23−24.]

- 11/15/21 – "As of today, Nov. 15th, 2021, it has been Ten (10) full days that (once again) I have not been given ANY pain medication for my Back and Spinal injuries. The issue is that once again, the medical Dep't was notified immediately that my pain medication ran out – this time it is Flexeril – and yet 10 days later I still have not been called for Sick Call to even get scheduled to see a NP to get meds prescribed. I told RN Jones face to face on 11/5 that my meds ran out. All she said was 'put in for sick call.' Your NP's negligence is responsible for my PAIN."

  Bland's Reply on 11/27/21 – "It is documented in Sapphire that you have been receiving your Mobic for pain since 10/7/21 every day. You have also been issued muscle rub on 10/7, 10/27, 11/3, 11/25. Flexeril expired on 11/5. You have a pending provider appt. *Id.* at 41. [Subsequent grievance rejected as untimely, not identifying how he was personally affected. Intake decision upheld. *Id.* at 42−43.]

- 11/30/21 – My specific issue is – once again – the amount of time the medical Dep't. has allowed to pass without seeing me to renew my PAIN medication, nor just renewing it after being notified FOUR times in the past 25 days. NO PAIN medication for 25 days even though I notified RN Jones personally on Nov. 5th; submitted two (2) Medical Requests for treatment (on 11/8 and 11/15), submitted an Informal Complaint; & even had an RN on Nov. 18th personally submit my

need for medication. This is medical negligence, deliberate indifference; and cruel & unusual punishment.

Bland's Reply on 12/10/21: "You seen the provider on 12/1/21 and was reordered your Mobic, Cymbalta, Tylenol for pain. You were seen on sick call on 11/19/21 for pain referral." *Id.* at 45. [Subsequent grievance unfounded at Level I. *Id.* at 46−49.]

- 1/4/22 – "The issue is that the medication prescribed for me 12/1/21 – a renewal of my simethicone antacid KOP med and a new prescription for KOP Tylenol – still have not been given to me. *My needed medication still, as of 1/04/22, has not been given to me! . . . I AM IN Pain."

  Bland's Reply on 1/14/22: "Tylenol was administered on 1/9/22 KOP, My Acid gas chews was issued 1/9/22 – KOP." *Id.* at 50. [Subsequent grievance unfounded at Level I and Level II. *Id.* at 51−53.]

- 6/5/22 – "I was prescribed 'Zanaflex' for 14 days by the (female) doctor at my last appt. 2 weeks ago. My first dose – the first time I received the medication was Sunday morning, May 29th, 2022. My 'last dose' was given to me Friday morning, June 3rd. That is only 6 days! As usual, someone's ineptness or ignorance or simple negligence has resulted in me NOT receiving my medication AND Being in PAIN – needless PAIN.

  Starkey's Reply on 6/17/22: "This medication was ordered 6/8/22." *Id.* at 54.

In addition to the written complaints and grievances, Cavalieri attempted on one occasion to discuss the medication issues with Nurse Bland in person outside of pill call, but she did not respond to him and kept walking. *Id.* at 125−126. He spoke to Nurse Starkey, the head nurse, on several occasions about how many days he had been without medication at different points in time. He also asked her why the system could not be modified so that people who needed only prescription refills could be scheduled directly with the provider without having to go through sick call first. She replied that this was policy from Dr. Ohai. *Id.* at 127.

Although Cavalieri has continued to have problems getting all medication in a timely fashion, Bland frames the issue as one of pain management for his back. While she acknowledged "brief lapses" in Cavalieri receiving prescribed medications, she stated that he

was on multiple pain management medications and that he was never completely without any pain medication; further, he had access to purchase Tylenol, ibuprofen, aspirin, and over-the-counter naproxen at the commissary. Dkt. No. 204-2, ⁋ 26. She never knew about specific incidents of medication lapses until he filed requests or grievance complaints, and by then the medicine had already been renewed or renewal was in progress. *Id.* at ⁋ 27. She also blamed Cavalieri for some of the delays, saying he had not submitted timely refill requests and that he was a no-show at pill pass.[3] The other delays she described as "beyond [her] control," such as delays of outside pharmacies in processing and delivering medication or delays between a provider writing a prescription and availability of the prescription in the electronic system. *Id.* Finally, she stated that Buckingham's medical department provided substantial non-pharmaceutical treatment for Cavalieri's back pain, including referrals for physical therapy, steroid injections, diagnostic imaging, a self-exercise program, a back brace, and other conservative treatment, some of which Cavalieri rejected. *Id.* at ⁋ 28.[4]

---

[3] Cavalieri acknowledged that he did not timely request refill of Flexeril in November 2021, because he did not know that the prescription was only for 30 days. He requested sick call and medication refill on November 5, the last day he received a pill under the expiring prescription. It was 47 days before he received the medication again. Had he submitted the sick call request two to three weeks before the prescription expired, as Bland said was necessary, he still would have gone without medication for more than two weeks. For the remaining medication gaps, Cavalieri states that he put in timely and multiple requests for renewal. Regrettably, the file contains only sick call notes, not copies of the requests for sick call appointments, so this will be a credibility issue for the fact finder at trial.

While Cavalieri had a significant number of no-shows between April 2022 and September 2022, from October 25, 2019, to January 31, 2022, a period of 27 months encompassing all but the last complaint/grievance listed above, the MARs reflect that Cavalieri was a "no show" for medication on 19 days. On many of those days, he missed an evening only or morning only dose. These were different time periods than when Cavalieri claimed he did not receive his pain medication.

[4] Although Buckingham's health care providers tried to refer Cavalieri for physical therapy or steroid injections, officials higher in the DOC denied the referrals. The only treatment he

## III. Discussion

To prevail at the summary judgment stage on a claim for deliberate indifference/delay in medical care, a plaintiff must show sufficient facts to support both objective and subjective elements of the claim. Objectively, he must show facts from which a factfinder could conclude that the medical need for which he sought treatment was serious. *Formica v. Aylor*, 739 F. App'x 745, 754−55 (4th Cir. 2018). Plaintiff must also show facts to support finding that the delay in treatment caused him some substantial harm, such as serious exacerbation of his condition or prolonged severe pain. *Id.* at 755. Subjectively, the plaintiff must show facts which, if accepted, support finding that the defendant perceived facts from which he could infer substantial risk to the plaintiff, that he in fact drew the inference, and that he then disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### A. Objective Elements- Serious Medical Need and Substantial Harm

A serious medical need is one that has been diagnosed by a physician as needing treatment or that is so obvious even a lay person would recognize the need for medical attention. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Cavalieri offers evidence sufficient to show that his medical needs were serious as to claims 1 and 3. The Fourth Circuit has recognized that a tooth cavity is an objectively serious medical condition because, left untreated, the cavity poses an excessive risk of further decay of the tooth and of unnecessary prolonged pain. *Formica*, 739 F. App'x at 756. Cavalieri received diagnoses that tooth #12 and tooth #28 had cavities which needed treatment. Additionally, a lay person would recognize the need for prompt

"rejected" at Buckingham was insoles for his shoes, plus three times in those 27 months, he rejected a single pill at pill call, not an overwhelming rejection of medical treatment. Cavalieri had refused physical therapy and steroid injections at Sussex II penitentiary, before he came to Buckingham, because he hoped to have surgery. By the time he got to Buckingham after continuing in prolonged pain, he had reconsidered and requested those treatment options.

dental attention once the affected teeth became painful. Cavalieri's evidence shows that delayed care caused a marked exacerbation of his condition or that it unnecessarily prolonged his pain. That is, he suffered severe pain during the last months of delayed treatment, and two previously restorable teeth ultimately required extraction.

Cavalieri also provides evidence that claims 2 and 4 involve serious medical needs. In both claims, qualified health care professionals prescribed medication for treatment of pain caused by a diagnosed condition. For claim 2, the surgeon prescribed post-operative medication following the extraction of his tooth to be given every six hours after the surgery to control pain. For claim 4, Cavalieri had been diagnosed with several chronic conditions, including degenerative disc disease, a bulging disc, arthritis, and excessive gas, for which various medications were prescribed by his doctors. Cavalieri asserts that the 18-hour delay in giving him post-operative medication prolonged his pain, and that going without his other medications (especially the Pamelor, Mobic, and Flexeril) caused serious, prolonged pain and spasms in his back, along with decreased ability to perform normal activities of living. Cavalieri provides sufficient facts from which a factfinder could conclude that the delay in receiving pain medication was a serious medical need.

**B. Subjective Elements**

For the subjective element of his claims, it is necessary to look at the evidence regarding each individual defendant on each claim to determine whether that defendant knew that his or her actions created a serious risk of harm to Cavalieri and disregarded the risk. In other words, "At summary judgment, a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind." *King v. Riley*, 76 F. 4th 259, 269 (4th Cir. 2023).

However, proof of a defendant's knowledge is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

**a. Claim 1 – Deliberate Indifference Regarding Tooth # 12**

***i. Shanks***

Cavalieri identified his need for medical treatment on four teeth upon his arrival at Buckingham in October 2019. He regularly requested treatment for his teeth and filed numerous grievances about not receiving such treatment. The record at summary judgment shows that between October 2019 and November 4, 2020 when the oral surgeon extracted tooth #12, Cavalieri either requested in writing that a dentist examine his teeth or he filed grievances complaining about the lack of care at least 5 times. Shanks responded every time that he was scheduled to see a dentist. But Cavalieri did not see any dental provider about the problems with tooth #12 until he saw the oral surgeon on November 4, 2020. Cavalieri's documented correspondence over those months, responded to by Shanks who had been a dental assistant for decades, allows a factfinder to conclude that Shanks must have known of the risk in delaying his care for so many months. The risk of an untreated cavity deteriorating into an unsalvageable tooth could be considered obvious, plus Cavalieri expressed that risk in his written requests for dental service. I find that material issues of fact exist as to whether Shanks was deliberately indifferent to Cavalieri's need for dental care and did not take any further steps to get him treatment.

The assertion that COVID and the Governor's Orders of Public Health Emergency entered in mid-March 2020 excused the delay in treatment does not automatically justify summary judgment in Ms. Shanks's favor. Given Shanks' deposition testimony that inmates were evaluated for fillings within 30 to 60 days of the request, the factfinder could conclude that

Shanks had ample opportunity between the end of October 2019 and the first part of March 2020 to schedule Cavalieri to see the dentist. If she did not know of Cavalieri's need for a filling until January 15, 2020, that was still more than two months before COVID and the Governor's declared state of emergency. Shanks also testified that when she wrote "You are scheduled with dental," she typically meant that an inmate was on the schedule for a date certain.

Even after the Governor's emergency order, the defendants fail to explain exactly how COVID prevented scheduling Cavalieri for cavity fillings, especially if a rotating dentist was present on site 10 hours per day, Monday through Thursday of each week. *See Hawkins v. Allen*, 743 F. Supp. 3d 765, 777 (E.D. Va. 2024). The Governor's emergency order allowed health care providers, including dentists, to perform "any procedure or surgery that if delayed or cancelled would result in the patient's condition worsening." Dkt. No. 204-1 at 51. The Fourth Circuit has recognized that delay in filling a cavity will cause the patient's condition to worsen, by causing further tooth decay, severe pain, and possible loss of the tooth. *Formica*, 739 F. App'x at 756. At any rate, the emergency order originally expired April 23, 2020, and was extended by Amendment only one time, until April 30, 2020, more than six months before the tooth was extracted.

By mid-August 2020, Cavalieri was complaining of severe pain in his tooth, which raised the classification of his dental condition to Class 3, urgent dental conditions that, while not life threatening, have high priority and require prompt attention due to extreme pain or need for immediate intervention to prevent exacerbation of the condition. The very first example of a Class 3 condition is "severe, unrelenting toothache." Under DOC policy in effect at the time, an inmate with a Class 3 condition "will be seen the next available clinical day." VDOC Op. Proc. 720.6(IV)(B)(3)(b). Cavalieri was not seen for any dental care until November 4, 2020, 10

months to one year after he first requested a filling for his cavity, and two and a half months after the tooth had become painful and required extraction. Both the Fourth Circuit and the Eastern District of Virginia have found that such delays in filling a tooth can allow a finding of deliberate indifference. *Formica*, 739 F. App'x at 756; *Hawkins*, 743 F. Supp. at 776. Accordingly, credibility questions and factual disputes remain to be resolved at trial and summary judgment will be denied to Shanks on this claim.

**ii. *Bland***

Defendant Bland, the Health Authority for Buckingham, is responsible for ensuring timely delivery of adequate health care services at Buckingham, including dental care. VDOC Op. Proc. 720.6(I)(A). Nonetheless, the evidence must show or infer that she actually knew that her action or inaction created a serious risk of harm to Cavalieri and disregarded that risk. The evidence for claim 1 falls short. While Cavalieri's medical request of August 28, 2020, is directed to Ms. Bland, the response came from Ms. Shanks. Consistently, Ms. Bland testified that if dental inquiries were addressed to her, she typically referred them to Ms. Shanks to answer. Dkt. No. 211-2. Administrators may delegate tasks to subordinates without becoming liable for the subordinate's constitutional torts. Government officials have no vicarious liability for the constitutional conduct of their subordinates. *King v. Riley*, 76 F.4th 259, 269 (2023).

There is no documentation of other correspondence that Ms. Bland necessarily saw to put her on notice of Cavalieri's problem with tooth # 12 or his long-standing difficulty getting full and accurate information from Ms. Shanks. Cavalieri testified that Bland rarely left her office, so it was difficult to speak with her. When asked who he spoke with about his ongoing tooth problem, he listed several people that he spoke to, but he said only that he wrote to Bland. Dkt.

No. 211-3 at 97−98. Receiving a single inquiry and delegating the response to another appropriate person is not enough to show deliberate indifference for this claim.

**iii. *Starkey***

Nurse Starkey began work in the medical department at Buckingham in November 2019. She worked as a nurse until April 2020, when she was promoted to nursing supervisor. As a supervisor, her role was administrative and limited to supervision of nurses in the medical department. Her only medical involvement with Cavalieri was when she saw periodically saw him at pill call. Dkt. No. 204-3 at ⁋ 5. I find nothing in the record to show that Starkey had knowledge of Cavalieri's prolonged delay in getting treatment for tooth # 12. Cavalieri testified that he spoke with her about the situation, and she told him to put in a request with dental. That was an appropriate response, given that she had no responsibility for providing or scheduling dental treatment. Not every prison employee who knows about an inmate's problem is deliberately indifferent for failing to resolve it; the employee's role and duties in the prison must be considered. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989). When Cavalieri complained of pain in his tooth, Starkey did not ignore him. She told him to put in a request to see the dental department, which was the proper procedure. That is not indifference.

**iv. *Meinhard***

Cavalieri maintains that Meinhard was deliberately indifferent because she ignored indications that Cavalieri was not receiving treatment for his medical needs. A non-medical prison official's ability to rely on the responses of medical personnel is "not without limits," and officials who ignore indications that a prisoner is not receiving any treatment can be held liable for deliberate indifference to those needs. *Rhoads v. Riddell*, 180 F.4th 171, 182 (4th Cir. 2026).

Although Meinhard received and logged only the informal complaint filed October 26, 2020, stating that Cavalieri had not yet been seen by the oral surgeon to remove his painful tooth, as he had been promised over a month earlier, Cavalieri testified that he spoke personally with Meinhard six times between February and August 2020 about the delay in getting dental treatment for the upper left molar despite repeatedly being told that he was scheduled to see the dentist. Cavalieri also states he tried to file grievances about not being seen, but because Ms. Shanks responded to all requests by saying "you are scheduled to see the dentist," Meinhard would not allow Cavalieri to file a grievance. This is corroborated to some extent by the informal complaint of August 10, 2020, against Meinhard for refusing to accept his grievances. This evidence creates a factual issue regarding whether Meinhard ignored indications that Cavalieri's serious dental needs were not being met. The Institutional Ombudsman is supposed to refer departments or staff not in compliance with the grievance process to the Warden. Va. DOC O.P. 866.1, *Offender Grievance Procedure, Institutions,* effective Jan. 1, 2021, § VIII(E)(4). From the evidence, a factfinder could infer that Meinhard knew that Cavalieri had not seen a dentist, despite being told repeatedly that he was scheduled, and she failed to report this to the Warden.

Meinhard's argument that this claim is based on an alleged "extractions only" policy misconstrues the nature of the claim. Cavalieri's claim is for unconstitutional delay in providing adequate dental care, and the claim was fully exhausted by his Complaint of November 5, 2020, and subsequent grievance and appeals. I will deny summary judgment on this claim.

**v. *Warden Woodson***

Like any other official, a Warden can be liable for deliberate indifference if he ignores indications that a prisoner is not receiving adequate treatment. On this claim, however, the only

evidence is that Cavalieri spoke with Woodson one time, advising that he had not seen the dentist, because there apparently was not one on site, and that he wanted to be referred to an outside dentist. Woodson responded that he did not know there was not a dentist and said he would "look into it." Cavalieri did not hear back from Woodson. This alone is not sufficient to show deliberate indifference. Woodson could have forgotten about the conversation, which would be at most simple negligence, or he could have checked and been told that there were dentists on rotation and that Cavalieri was "on the list." Either way, the facts do not support a claim of deliberate indifference by Woodson.

**b. Claim 2 – Delays in Receiving Post-Surgical Pain Medication**

This claim is filed against Bland and Starkey only. It is not alleged that Bland or Starkey specifically failed to give Cavalieri his medication. Rather, Bland was the Medical Authority and Starkey was the head nurse. It is undisputed that the surgeon's order for Tylenol and Advil three times per day were put into the system at 4:00 p.m. on November 4, 2020, and that Cavalieri's medication was first available at 10:40 a.m. on November 5, 2020 (the second pill call of the day), more than 18 hours later. Cavalieri says that he received the Advil (Motrin) only on November 5, and only at 10:40 a.m. Bland states that neither she nor Starkey were involved in entering the prescriptions and that neither of them knew he needed those prescriptions until after-the-fact. Dkt. No. 204-2 at ⁋ 14. Cavalieri appears to suggest that Bland and Starkey are liable because of their supervisory positions, but that is not sufficient to support a finding of deliberate indifference. Cavalieri has offered no evidence to suggest that either of them knew he did not receive his post-surgical pain medication until after the fact. Without such knowledge, they could not be deliberately indifferent.

Responsibility for distributing medication falls to the entire nursing staff, depending on who is assigned to pill call on a given day. The MAR includes the initials of the person distributing medication each date, and a legend at the bottom of the form identifies the name associated with initials. AH (Allison Hunter) initialed that Cavalieri was a "no show" for mid-day and evening medication rounds on November 5. Bland (DB) distributed his medication mid-day and evening on November 9 and evening on November 11, 2021. In her affidavit, Starkey acknowledges that she occasionally administered Cavalieri's pill pass medications, but her initials are not on the November 2020 MAR for Cavalieri's medicine.

**c. Claim 3 – Deliberate Indifference Regarding Tooth # 28**

**i. *Shanks***

Cavalieri's need for restorative treatment for four cavities was made known by the surgeon who extracted tooth # 12 on November 4, 2020. Cavalieri followed up with numerous requests to be treated before these teeth also needed to be extracted. Shanks knew of a problem with the lower right molar even earlier, however, because Cavalieri mentioned it in his August 24, 2020, request to see the oral surgeon to extract tooth # 12.

Especially after Cavalieri's history with tooth # 12, the long trail of dental requests, complaints, and grievances regarding his lower right molar, tooth # 28, along with the frequent incorrect information provided in response to complaints, is sufficient to support a claim of deliberate indifference against Shanks for this tooth. She was responsible for scheduling. Even if the tooth was filled in April 2021, which is disputed by Cavalieri, waiting nearly six weeks for extraction of a tooth that had become extremely painful by mid-July is sufficient to support a claim of deliberate indifference. *See, e.g., Smith v. Knox County Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) ("Even a few days' delay in addressing a severely painful but readily treatable

condition suffices to state a claim of deliberate indifference."); *Martin v. Cook County Dept. of Corr.*, No. 10 C 2162, 2013 WL 1181491, at *6 (N.D. Ill. March 20, 2013) (holding that delay of three weeks in providing pain medication and one month before extracting tooth was sufficient to survive summary judgment motion); *Mallette v. Dunning*, 896 F.2d 546 (4th Cir. 1990) (unpublished per curiam) (favorably citing *Fields v. Gander*, 734 F.2d 1313 (8th Cir. 1984) (finding summary judgment for defendants inappropriate when prison officials knew of prisoner's pain and failed to provide dental care for three weeks).

**ii. *Bland***

Cavalieri directed a written complaint to Nurse Bland on August 11, 2021, about his tooth not being extracted despite three requests, three informal complaints, and three grievances. Just as with the complaint to Bland about tooth # 12, this appears to be the only written notice Bland received of the problem with tooth # 28. Further, Cavalieri's tooth was extracted on August 24, before anyone wrote a response to the complaint. Bland did not have notice in time to do anything about the delay that had already occurred. One cannot infer deliberate indifference from her actions.

**iii. *Starkey***

The evidence is that Cavalieri complained to Starkey, verbally, that he wasn't getting proper dental care, and she advised him to talk to Shanks, because she (Starkey) did not work in the dental department. Later, the complaint of August 11, 2021, directed to Bland, was assigned to Starkey on August 12. Starkey has no memory of reviewing this Complaint, and her handwriting is nowhere on it. Dkt. No. 204-3 at ⁋ 24. The complaint was ultimately responded to by A. Worrell, after the extraction had already occurred on August 24. Dkt. No. 211-10 at 9. This is insufficient to infer that Starkey was deliberately indifferent towards Cavalieri's needs.

**iv. *Meinhard***

In addition to the evidence of Meinhard's knowledge before the extraction of tooth # 12, Meinhard saw far more complaints and grievances after Cavalieri returned from his extraction in November 2020. Her affidavit lists those grievances. Dkt. No. 208-3 at 7–9. On November 5, 2020, Cavalieri filed a complaint, followed by a grievance on November 27, about the lack of a dentist at the prison and delay in care that led to tooth # 12 decaying to the point that extraction was necessary. The grievance was denied as unfounded, and the finding was upheld at Level II. On December 26, 2020, Cavalieri filed an informal complaint that he was not being scheduled for the four fillings recommended by the oral surgeon on November 4, 2020. Shanks responded that Cavalieri was being referred out for dental treatment, so Cavalieri did not continue with the grievance process. On March 15, 2021, Cavalieri filed a written complaint, stating that Shanks had told him three times he would be seen by a dentist, but he had neither been seen nor referred out. Shanks responded that he was seen by an oral surgeon on March 16, which was not accurate. Cavalieri attempted to file a grievance on March 31, pointing out that he had NOT seen either an oral surgeon or a dentist on March 16, but Meinhard rejected the grievance as being different from the March 15 complaint. Between November 5, 2020, and March 15, 2021, four and a half months, Meinhard had seen and processed five different forms, complaining that Cavalieri had not been seen, needed fillings for his cavities, that the facility had no dentist, and that Shanks kept providing inaccurate information.

As previously discussed, a dentist at the prison finally saw him on March 25, 2021, confirmed that he had multiple cavities in four teeth. Cavalieri was scheduled for fillings on April 6, 2021. There is a factual dispute about whether tooth #28 was filled at the time. Cavalieri states that the dentist said the cavity was too deep to fill; the dental notes indicate that

the cavity on # 29 (the tooth with only one cavity, called #28 in all other records) was deep, and if Cavalieri experienced any pain, an extraction might be needed. Dkt. No. 204-1 at 41.

Starting in mid-July, the tooth became painful and Cavalieri began requesting extraction. On July 24, 2021, Meinhard received a written complaint that dental had ignored multiple requests to have the lower right molar extracted, as it was causing constant pain. Shanks responded that Cavalieri was "scheduled with dental." Meinhard then received copies of emergency grievances on July 30, August 2, and August 4, 2021, a written complaint on August 11, 2021, and a regular grievance on August 23, 2021, all with the same complaint, and all except the last grievance with the same response, "You are scheduled with dental." The tooth was finally extracted on August 24, and the grievance was then denied as "unfounded," which finding was upheld at Level II. Dkt. No. 208-3 at 8−9. Again, Meinhard had received and processed two written complaints and a grievance and had received copies of three emergency grievances over a four-week period, all complaining of severe pain.

The responsibilities of the Grievance Coordinator/Institutional Ombudsman are more than making sure that complaints and grievances are properly submitted and timely filed. She must accept all Written Complaints (previously called Informal Complaints) for consideration, unless the inmate has been restricted to a limited number of filings for abusing the process. Following acceptance, in reviewing the complaint, an appropriate staff member should speak with the offender "to better understand and respond to the offender's complaint." Va. DOC O.P. 866.1, *Offender Grievance Procedure, Institutions*, effective Jan. 1, 2021, § II(B)(3). If the complaint is about medical or dental care, the coordinator must then forward the complaint to the appropriate department to resolve and respond to the complaint. The department must send a copy of the response to the Grievance Coordinator to log into VACORIS. *Id.* at § II(B)(4).

Once a grievance has been accepted, "the Institutional Ombudsman determines the course of investigation." *Id.* at § III(D)(1). The Ombudsman or designee "should have a face-to-face conversation with the submitting offender to ensure comprehension of the issue." *Id.* at § III(D)(3). The Ombudsman ultimately prepares the Level I response, based on the investigation, for the Warden's review and ultimate signature. *Id.* at § III(F)(1)(b)(d). Finally, the Institutional Ombudsman is supposed to refer departments or staff not in compliance with the grievance process to the Warden. *Id.* at § VIII(E)(4). A factfinder could conclude that Meinhard should have reported the dental department's repeated failure to follow through in a timely manner on its promised resolution of Cavalieri's complaints of pain. The duties of the Ombudsman increase the risk of ignoring indications that a prisoner is not receiving adequate treatment, and Cavalieri has come forth with sufficient facts at this stage to support his claim that Meinhard was deliberately indifferent to those needs. *See Rhoads*, 180 F.4th at 182. Further, the claim was properly exhausted by his grievance of August 23, 2021, and subsequent appeals.

**v. *Woodson***

There is no evidence to support deliberate indifference by Woodson. The conversation between Cavalieri and Woodson occurred before the first tooth extraction, and there is no evidence that Woodson had any knowledge of Cavalieri's ongoing dental problems thereafter. That he is the "head of the ship" responsible for running the prison does not impose a constitutional obligation to know everything that happens in the dental department. Without specific knowledge that Cavalieri was not getting adequate dental care after November 2020, Cavalieri cannot establish the subjective component of deliberate indifference.

**d. Claim 4 – Deliberate Indifference to Continuity of Prescriptions**

Bland and Starkey are the only remaining defendants on this claim.

**i. *Bland***

As itemized in the statement of facts, between May 19, 2020, and January 4, 2022, Cavalieri filed 10 complaints or grievances specifically about going without prescription medication because he was not seen in a timely manner to renew the medication. Bland was the person who responded to 9 of those complaints, including one on October 19, 2020, stating that "The Medical Dep't. has made a HABIT out of: not reordering my prescriptions in a timely manner." Dkt. No. 211-11 at 3. By October 19, 2020, Bland was certainly on notice of a *recurring* problem with lapses in prescription medication. Further, as the Health Authority for Buckingham, her job description included responsibility for ensuring timely access to adequate health care services, including that "the continuity of health care *including medication* will be available from admission to discharge." VDOC Op. Proc. 720.1(I)(B)(1) (emphasis added).

Bland described in her deposition how medication renewal is supposed to work. Pain management medications, such as the Pamelor, Mobic, and Flexeril prescribed for Cavalieri's degenerative spinal condition, cannot be renewed automatically. The inmate must be seen by a provider with prescribing authority to renew the prescription. Dkt. No. 211-2 at 31. If the health care provider needs to see the patient in follow-up (for a reason other than medication renewal), a follow-up appointment will be scheduled. Otherwise, it is up to the inmate to put in a sick call request to be referred to the provider when his medication needs to be renewed. *Id.* at 32, 34. Nurses collect the sick call slips each morning before 9:00 or 10:00, and the nurse assigned that day to triage evaluates and prioritizes the requests, so that the most urgent requests are scheduled to be seen by a nurse most quickly. That triage process takes one or two days. *Id.* at 23−24. The policy is that an inmate should be seen by a nurse in sick call within 72 – 96 hours, although

during COVID, it took longer because of social distancing restrictions and fewer available appointments. *Id.* at 70.

When the inmate is scheduled to see the nurse, he is called to medical to be seen by an R.N. or an L.P.N. The nurse evaluates the inmate to see if an appointment with a nurse practitioner or medical doctor is appropriate and necessary, as it is for prescription refills because nurses cannot prescribe prescription medication. Then a follow-up appointment is scheduled with the health care provider. The goal is for the patient to be seen before the prescription expires; to accomplish this, the inmate needs to submit his sick call request for renewal about two to three weeks before he runs out. *Id.* at 32−33. Once the patient is seen, the provider orders the medicine, and the order is sent to Diamond Pharmacy in Pennsylvania. It takes two or three days for the pharmacy to fill the prescription and ship it back to the prison, where it must be checked in by the nurse, and then it can be administered in the next pill line. *Id.* at 46−47.

For "keep on person" medications, ("KOP"), an inmate receives a 30-day supply of the medicine on a card with each dose individually wrapped in a plastic bubble. When the inmate gets down to the last eight to ten pills, the bubble strip is blue, and the inmate can have the strip scanned by the nurse to submit it for refill. When the card runs out, they take the empty card to the nurse and pick up the refilled medication, if it has arrived. *Id.* at 58. If the prescription needs to be *renewed*, the inmate must still see the provider, and it is up to the inmate to initiate that by requesting a sick call. *Id.* at 62. There is no policy in place regarding how the sick call request should be prioritized if an inmate is about to run out of medication. *Id.* at 63. Further, if an inmate tries to refill or renew a KOP medicine too early (before the last 8-10 pills), the system will not process it. *Id.* at 66. In other words, for KOP medicine, if an inmate submits the request for sick call two to three weeks early, as necessary to ensure being timely seen for renewal, *the*

*system will not process the request*. Some of Cavalieri's medications with delayed refills were KOP medications, including Naproxen and Simethicone. *See, i.e.,* Dkt. No. 204-2 at 150.

Cavalieri's grievances about medication lapses provide ample examples (59 pages) of where this policy/procedure was breaking down and causing him to lack the medication he needed. In October 2020, he was without all of his medication, some for 19 days and some for 27 days. In December 2020, he saw the health care provider on December 8, when his prescription was renewed. As of December 21, he still had not received it. It finally arrived on December 29.

On July 24, Cavalieri complained that he had seen the nurse at sick call and been referred to the health care provider, but he had never actually been called to see the health care provider, and his medicine had run out. On September 2, Cavalieri complained that his Pamelor had run out and his naproxen would expire soon. By September 18, he had been without his Pamelor for 41 days. On November 15, he complained he had been without a pain medication (Flexeril) for his back for 10 days. He was without the medication for 46 days by the time he finally got it. The examples recurred nearly monthly.

Bland's responses did not acknowledge or address the systemic, recurring nature of the problems. Rather, she focused on the medication that had not been renewed on that particular occasion only and considered the issue resolved once Cavalieri got the medicine, no matter how long it had taken and no matter how many times it kept happening. Her response did nothing to relieve the pain he had already experienced from being without his medicine, nor did it address his main repeated concern, preventing the problem from happening again. In response to Cavalieri's complaint about running out of Flexeril, Bland stated that the nurse practitioner had prescribed him Mobic, which did nothing to address the fact that Cavalieri was supposed to be taking both medications, not just one. Mobic is a non-steroidal anti-inflammatory medication,

and Flexeril is a muscle relaxant.[5] Nortriptyline (Pamelor) is a tricyclic anti-depressant used in combination with other pain medications to treat nerve pain. Howard E. LeWine, M.D. ed., *Drugs that Relieve Nerve Pain*, Harvard Health Publishing (Feb. 26, 2024), https://www.health.harvard.edu/pain/drugs-that-relieve-nerve-pain. From July 2020 on, the health care provider prescribed combinations of different classes of drugs to deal with a complex pain problem. Each combination included one drug from at least two of the following categories: anti-inflammatories, such as Mobic, naproxen, or ibuprofen; muscle relaxers, like Flexeril or Zanaflex; analgesics, like Tylenol or muscle rub cream; and medicine for nerve pain, like Neurontin or Pamelor. A factfinder could infer that Bland, as a registered nurse and the institutional health authority, knows the fundamental differences between the categories of medication and that Advil, Tylenol, and other over-the-counter medication from the commissary is inadequate to provide constitutionally adequate care for nerve pain caused by a bulging disc.

A factfinder could infer deliberate indifference from the longstanding nature of the problem, the failure to make any policy changes to improve the continuity of care, and from Bland's responses to Cavalieri's complaints, which never acknowledged or addressed his concerns about the systemic issue. *See e.g. Gordon v. Schilling*, 937 F.3d 348, 360 (4th Cir. 2019); *Napier v. Ohai*, No. 7:23-CV-00098, 2025 WL 2779900, at *13 (W.D. Va. Sept. 26, 2025). I will deny her summary judgment motion on this claim.

**ii. *Starkey***

Starkey responded to two of Cavalieri's medication complaints, on September 2, 2021 and on June 5, 2022. In response to the September 2 complaint, Starkey noted that Cavalieri's

[5] Information obtained from Drugs.com PDR Overview, https://www.drugs.com/sitemap.html.

Nortriptyline was renewed on September 15.[6] I cannot find that Starkey had sufficient knowledge of the extent of this problem as a systemic issue, based on just two complaints over nine months apart. Further, Starkey's job duties as Chief Nurse were not focused on the policy and procedure aspects of the medical department. I will grant her Motion for Summary Judgment.

## IV. Conclusion

For the reasons stated, I will deny the Motions for Summary Judgment by Shanks and Meinhard on Claims 1 and 3, and I will deny the Motion for Summary Judgment by Bland on Claim 4. I will grant the remaining Motions for Summary Judgment and dismiss Nurse Starkey and Warden Woodson from the case.

An appropriate order accompanies this memorandum opinion.

Entered: October 30, 2026

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

[6] When Cavalieri complained on September 18 that he still had not received it, Bland responded that the medicine-Nortriptyline-had been ordered on September 20.